```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 11/20/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
PATRICK GONZALEZ,                   :
                                    :
                 Plaintiff,         :
                                    :   07 Civ. 2126 (LAP)(THK)
        -against-                   :
                                    :   **REPORT AND RECOMMENDATION**
                                    :
MARIA JONES, et al.                 :        **Pro Se**
                                    :
                                    :
                 Defendants.        :
------------------------------------X
**TO: HON. LORETTA A. PRESKA, UNITED STATES DISTRICT JUDGE**
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE**


      In this prisoner's civil rights action, Plaintiff Patrick
Gonzalez, proceeding pro se, claims he was deprived of adequate
medical care while he was incarcerated at the Sing Sing
Correctional Facility ("Sing Sing"). Defendants Maria Jones, R.N.,
John Perilli, M.D., and Steven Weinstein, M.D., have moved for
summary judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure.  Plaintiff failed to respond to the motion.  For the
reasons that follow, the Court recommends that Defendants' motion
for summary judgment be granted.

                          **BACKGROUND**

      Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services ("DOCS").  The events at issue
in this case took place primarily at Sing Sing, where Plaintiff was

                                1

incarcerated during the relevant period.  Plaintiff's claims arise out of a hypoglycemic episode he suffered on February 20, 2004, for which he was given intravenous dextrose to raise his blood sugar. Plaintiff alleges that the intravenous ("IV") line was inserted improperly, injuring his arm and causing him to develop carpal tunnel syndrome, and that he was improperly denied follow-up care for that injury.

Defendant Maria Jones, R.N. is a registered nurse, and was one of the medical staff who treated Plaintiff during his hypoglycemic episode.

Defendant Eileen Hansen, R.N. is a registered nurse who was employed as a Sing Sing Nurse Administrator at the time of the events at issue in this case.  She assisted Nurse Jones with Plaintiff's care during his hypoglycemic episode.[1]

Defendant Dr. Steven Weinstein is a physiatrist, a specialist in physical medicine and rehabilitation.  He has been employed by DOCS as an independent contractor since 2002.  Dr. Weinstein conducted an evaluation of Plaintiff's arm and hand condition because of the symptoms he suffered in the period following the hypoglycemic episode.

Defendant Dr. John Perilli was employed by DOCS as the Sing Sing Facility Health Services Director from 1999 to 2007.  He

---

[1]  Nurse Hansen was never served with process, and so did not join in the instant motion.

2

examined Plaintiff after receiving his complaints that the IV infiltration had injured his arm, and referred him to specialists for further testing.  Dr. Perilli also approved the surgery that Plaintiff underwent to treat his injured arm.

Defendant John Doe HMO is an unnamed entity that Plaintiff contends improperly denied approval for his post-surgery physical therapy, thereby diminishing the benefit Plaintiff obtained from the surgery.[2]

I. The Hypoglycemic Episode

Plaintiff suffers from type I diabetes, which is characterized by wide, unpredictable fluctuations in blood sugar levels that make it difficult to control. (See Declaration Of Defendant John Perilli, M.D. in Support of Motion for Summary Judgment, dated May 13, 2009 ("Perilli Decl.") ¶ 7.) On February 20, 2004, Plaintiff became severely hypoglycemic, meaning that his blood sugar dropped to dangerously low levels, which caused a diabetic seizure.

When Plaintiff's diabetic seizure began, he was rushed to the Sing Sing emergency room, where he was received by Defendant Jones. (See Declaration Of Defendant Maria Jones in Support of Defendants' Motion for Summary Judgment, dated May 13, 2009 ("Jones Decl.") ¶ 14; Defendants' Statement of Undisputed Facts Pursuant to Rule 56.1 ("Defs.' R. 56.1 Stmt.") ¶¶ 13-14.) Plaintiff was lying on a

---

[2] Defendant John Doe HMO was never identified or served with process, and so did not join in the instant motion.

3

gurney, thrashing his arms and legs, and moaning. (See Defs.' R. 56.1 Stmt.  ¶ 14; Jones Decl. ¶ 10.)  It was not clear whether he was conscious; he did not seem to be aware of his surroundings, but appeared to respond to the sound of his name.  Nurse Jones immediately tested Plaintiff's blood sugar, and found that it was dangerously low.  (See Defs.' R. 56.1 Stmt. ¶ 15; Jones Decl. ¶ 11.)

Nurse Jones took immediate steps to raise Plaintiff's blood sugar levels.  First, she tried to administer glutose, an oral glucose solution, but Plaintiff did not swallow it.  (See Defs.' R. 56.1 Stmt. ¶ 16; Jones Decl. ¶¶ 12-13.)  Jones noticed that he only "moved it around in his mouth," so she decided to inject a syringe of intravenous dextrose directly into one of Plaintiff's veins. (See Jones Decl. ¶ 12.)  That was also unsuccessful.  Plaintiff's flailing limbs knocked the syringe to the floor, where it shattered.  (See Defs.' R. 56.1 Stmt. ¶ 17; Jones Decl. ¶ 13.)

At that point, Nurse Jones called for assistance, and was joined by Nurse Hansen, the Nurse Administrator on duty.  (See Jones Decl. ¶ 14.)  Together, Jones and Hansen restrained Plaintiff's limbs so that they could insert an IV line into his left arm. (See id. ¶¶ 14, 15.)  Once the line was in place, the nurses administered 50 cubic centimeters of dextrose intravenously. (See id.)  However, Plaintiff failed to respond to the medication. Fifteen minutes later, Plaintiff still had not regained

4

consciousness, and a new test showed that he still had an extremely low blood glucose level.  The nurses removed the original IV and inserted a new one, again having difficulty because of Plaintiff's jerking limbs.  Once the new line was in place, they administered another dose of dextrose, but Plaintiff still did not respond.  The nurses then inserted a third line, and administered a third dose of dextrose, which was more successful.  Plaintiff's blood sugar level rose significantly, his seizure ended, and he regained consciousness.  (See id. ¶¶ 16-17.)

Nurse Jones then informed the physician's assistant on duty, P.A. Kwon, of Plaintiff's condition.  Kwon notified the physician on duty, Dr. Maw, who instructed that Plaintiff should be sent to an outside hospital via ambulance.[3]  (See Defs.' R. 56.1 Stmt. ¶ 23; Jones Decl. ¶ 18.)  Plaintiff was taken to Phelps Memorial Hospital ("Phelps") for examination.   At Phelps, Plaintiff told the doctors that his pain was a "two" on a scale of one to five. (See Phelps Memorial Hospital Triage/Nursing Record, dated February 20, 2004, attached as part of Exhibit D to Declaration of Assistant Attorney General Inna Reznik In Support of Motion for Summary Judgment ("Reznik Decl."), at 363.)  The physicians at Phelps examined Plaintiff and applied compresses to his swollen arm, then discharged him back to Sing Sing.

---

[3]Neither P.A. Kwon nor Dr. Maw is a defendant in this action.

Plaintiff stayed in the Sing Sing medical facility for the next three days. (See Admission & Discharge Summary, February 23, 2004, Reznik Decl. Ex. D at 36.)  During that time, medical staff noted that his left arm was "edematous," (swollen with fluid buildup inside the tissue), and had noticeable "purple discolorations" in the brachial area.  (See id.)  Nurses administered warm soaks and compresses to the arm on several occasions.  (See id.)  Once the Sing Sing medical staff were confident that Plaintiff's blood sugar was stabilized, they released him back to the general population.  (See id. at 47.)

## II.   Complications and Follow-up Treatment

Over the months that followed the hypoglycemic episode, Plaintiff continued to suffer from problems in his left arm and wrist.  He went to sick call regularly, complaining of pain, numbness, and tingling.  (See Plaintiff's March 1 and June 11 sick call request forms, attached to Amended Complaint ("Am. Compl.") at 43-44.)  The sick call nurses initially gave him Tylenol, which he claimed was ineffective.  (See Pl.'s March 1, 2004 letter to Sing Sing Superintendent, attached to Am. Compl., at 41-42 (claiming to have been in constant pain for the ten days following the IV insertion, and that he was receiving "Tylenol only" at sick call); Pl.'s March 1, 2004 sick call request form, attached to Am. Compl. at 43 (requesting "pain meds").)   On March 3, Plaintiff was also

6

examined by his treating physician, Dr. Halko,[4] who noted the edema in Plaintiff's forearm. (See Ambulatory Health Record, Reznik Decl. Ex. D at 58.) Over the following months, Halko attempted to relieve Plaintiff's pain with unspecified NSAIDs, (a group of pain medications that includes ibuprofen and naproxen, as well as prescription strength drugs), and by splinting his hand, but neither treatment was effective. (See Halko referral notes, May 22 2004, Reznik Decl. Ex D at 64; see also Weinstein notes on June 1, 2004 consult, Reznik Decl. Ex. D at 64.)

On March 11, Plaintiff was examined by Dr. Perilli,[5] who found no signs of inflammation or infection, but did determine that Plaintiff was positive for Tinel's Sign, a nerve response that often indicates carpal tunnel syndrome. (See Declaration of John Perilli, M.D. in Support of Defendants' Motion for Summary Judgment ("Perilli Decl.") ¶ 12.)   After that examination, Dr. Perilli and Dr. Halko referred Plaintiff to a specialist for a thorough physical, neurological, and muscular examination. (See id.)

---

[4] Dr. Halko is not a Defendant in this action.

[5] At that time, Defendant Perilli was the Facility Health Services Director at Sing Sing. (See Perilli Decl. ¶ 2.)   In that capacity, he supervised all health unit staff, and was responsible for all aspects of inmate health care.   He also reviewed requests for consultations with outside specialists, or recommendations for hospitalization and surgery, for medical appropriateness.   (See id. ¶ 5.)

Dr. Steven Weinstein conducted that examination on June 9, 2004.[6]   (See Declaration of Steven Weinstein, M.D. in Support of Defendants' Motion for Summary Judgment, dated May 14 2009 ("Weinstein Decl.")   ¶¶   6-10.)    Weinstein examined both of Plaintiff's arms.    (See Weinstein Consultation Report, Reznik Decl. Ex. D at 138-40.)   He began with a physical exam, which involved looking at the painful area to determine whether there were any noticeable problems, and then conducted a series of tests to determine the range of motion that Plaintiff had in his arms, wrists, and fingers.   (See id. at 138.)   He noted that there was "questionable thenar atrophy" — withering of the muscles of the palm area — on the left hand. (See id.)  He also found decreased sensation, weakness, and limited range of motion in the left wrist and fingers.   Like Dr. Perilli, Weinstein also found Plaintiff's left wrist positive for Tinel's Sign.   (See id.)

After the physical examination, Dr. Weinstein performed nerve conduction study (NCS) tests on both of Plaintiff's arms to evaluate nerve function.   He tested the sensory and motor nerves in the forearms and elbows of both arms.    After examining the results, and comparing the left arm readings to those from the

---

[6] As a contractor for the DOCS, Dr. Weinstein spends one day per week providing evaluations and care for physically disabled inmates. (See Weinstein Decl. ¶ 4.)   His duties include providing physical medicine and rehabilitation consultations, pain management evaluations, and electrodiagnostic tests. (See id.)

8

right, Weinstein concluded that there was "some degree of nerve damage" in Plaintiff's left arm.  (See id.)

Finally, Dr. Weinstein conducted electromyography (EMG) tests of Plaintiff's entire left arm, to check for muscle damage.  He found no problems in the arm or forearm muscles, but noted that there were some abnormalities in the muscles of the left hand. (See id.)

Dr. Weinstein diagnosed Plaintiff with "distal left Median and Ulnar neuropathies."  (See id. at 140.)  He did not prescribe any treatment for the condition, but did recommend that the prison medical authorities consider conducting an MRI of Plaintiff's left hand and forearm, and that Plaintiff return for another NCS/EMG evaluation in three months if there was no significant improvement.  (See Weinstein Decl. ¶ 10.)

In the period following that examination, Plaintiff continued to suffer from pain in his arm. On June 11, he went to sick call complaining of "excruciating pain in [his] left hand and forearm for over five months without treatment by a specialist." (See Plaintiff's June 11 Sick Call Request Form, attached to Pl.'s Am. Compl., at 43-44.)   One week later, Drs. Perilli and Halko referred him to an outside surgeon, Dr. Richard M. Magill, for a consult. (See id. at 28.)

Dr. Magill examined Plaintiff on July 29, 2004.  Dr. Magill concluded that the thenar atrophy and tendon adhesions observed

9

during the physical exam could be a sign that Plaintiff had suffered from mild compartment syndrome[7] at the time of the IV infiltration. (See Letter from Dr. Richard M. Magill to Dr. Halko, dated August 12, 2004 ("Magill Letter"), attached to Am. Compl. at 28.)  Magill did not speculate, however, as to the cause of the compartment syndrome.

Dr. Magill agreed with Dr. Perilli that Plaintiff's symptoms of tingling and numbness, along with the results of the neurological tests, were indicative of carpal tunnel syndrome. Concluding that conservative treatment would be unlikely to correct the tendon adhesions, Magill recommended both a standard carpal tunnel release surgery and an additional surgical procedure to release the damaged areas of the flexor tendons.  Plaintiff underwent the recommended surgery on September 22, 2004. (See id.)

III.   The Post-Surgery Period

---

[7] Compartment syndrome is a phenomenon that occurs when a body part swells, causing increased pressure inside the "compartments" created by inelastic fascia.  The increased pressure crushes tissue within the confined space, limiting blood flow and injuring the muscle and nerve fibers there.  Compartment syndrome is most often associated with swelling from trauma, (such as a broken limb or crush injury), or from surgery. However, it can also be caused by bandages or casts that are too tight, or by repetitive exercise.  The standard treatment for the condition is surgery.  (See Medline Plus Encyclopedia, Compartment Syndrome, available at http://www.nlm.nih.gov/medlineplus/ency/article/001224.htm (last visited Nov. 17, 2009).)

Dr. Magill prescribed physical therapy as a follow-up to Plaintiff's surgery. However, after an initial evaluation by a Sing Sing therapist, Plaintiff claims he received no further treatment until the following year. According to Plaintiff, even then the therapy sessions remained sporadic. (See Grievance Requests and Responses, attached to Am. Compl. at 34-40.) Although he filed several grievances with the prison's administrators, Plaintiff claims that he was told he could not receive therapy until the treatment was approved by an unspecified HMO in Texas. At his deposition, in October of 2008, Plaintiff testified that, by then, he had received approximately fifteen therapy sessions. (See id., at 39; Transcript of Plaintiff's October 28, 2008 Deposition, ("Gonzalez Dep.") at 159:2.) Plaintiff contends that, because he did not receive physical therapy, he has failed to regain full movement in his hand, and has suffered lasting pain and other ill effects. (See Gonzalez Dep. at 159-61.)

## DISCUSSION

Defendants Jones, Perilli, and Weinstein make three arguments in support of their motion: (1) that they provided Plaintiff with proper medical care during and after the hypoglycemic episode, and, therefore, cannot be found to have acted with "deliberate indifference" to his medical needs; (2) that neither Dr. Perilli nor Dr. Weinstein had sufficient personal involvement in

Plaintiff's care to be liable for the alleged constitutional violations; and (3) that, in the alternative, all three Defendants are entitled to qualified immunity.

I. Summary Judgment Standards

A. Federal Rule 56

Under Rule 56(c)of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless a court determines that there is no genuine issue of material fact to be tried, and that the moving party is entitled, as a matter of law, to judgment in its favor. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98 (2d Cir. 2003). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Once a properly supported motion for summary judgment has been submitted, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at trial. See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003); Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553).

12

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006). However, the non-moving party must put forth "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514; Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).

B. Local Rule 56.1

Under the Southern District of New York's Local Civil Rule 56.1, a party moving for summary judgment must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule of the Southern District of New York 56.1(a) ("Local Rule 56.1"). Significantly,

13

"[e]ach numbered paragraph in the statement of material facts set forth in the statement . . . will be deemed to be admitted for purposes of the motion unless the nonmoving party specifically controverts each item by a correspondingly numbered paragraph in the statement . . . ." Local Rule 56.1(c).   Both parties' statements must be "followed by citation to evidence which would be admissible" under Federal Rule of Civil Procedure 56(e). Local Rule 56.1(d).   Finally, the moving party must provide notice in a separate document, to a non-moving, pro se party, that failure to comply with Local Rule 56.1 may result in dismissal of the case without trial.   See Local Civil Rule of the Southern District of New York 56.2 ("Local Rule 56.2").

A non-moving party's failure to adhere to Local Rule 56.1(b) can prove fatal because "[c]ourts in this circuit have not hesitated to deem admitted the facts in a movant's Local Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party."   Gadsden v. Jones Lang LaSalle Americas, Inc., 210 F. Supp.2d 430, 438 (S.D.N.Y. 2002) (collecting cases); see also Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000) (summary judgment "appropriate" in light of non-moving party's failure to comply with Local Rule 56.1(b)).

Nevertheless, Local Rule 56.1 "does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1

14

statement is not itself a vehicle for making factual assertions that are otherwise unsupported by the record." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

II. Plaintiff's Failure to Comply With Local Rule 56.1

Plaintiff clearly failed to adhere to the requirements of Local Rule 56.1. Defendant, as the moving party, properly submitted a separate statement of facts with citations to supporting evidence in the record, pursuant to Local Rule 56.1(a). Defendant also satisfied Local Rule 56.2's notice requirement by advising Plaintiff that failure to properly respond in accordance with the rules could result in facts being deemed admitted and the case being dismissed without trial. (See Defendants' Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment, dated May 15, 2008.)

Plaintiff, however, did not respond to Defendants' motion, filed on May 15, 2009, by the Court-ordered deadline of June 19, 2009. (See Revised Scheduling Order, dated March 26, 2009.)   In fact, it was not until nearly three months after the deadline had passed, on September 4, that Plaintiff submitted a letter to the Court claiming to have been unable to respond to the motion because he was in "cell confinement" at the time he received it, and, therefore, lacked access to the law library. (See Plaintiff's Letter to the Court, dated September 4, 2009.)   In the letter,

Plaintiff committed to filing his response to the motion "forthwith," and asked that the deadline for its submission be extended to October 16, 2009. Plaintiff's request itself was untimely. If Plaintiff was unable to comply with the Court-ordered deadline, he should have requested an extension of time before the deadline had already passed.[8] In any event, Plaintiff's proposed October 16 deadline passed over a month ago, and he still has not responded to Defendants' motion, which was filed over six months ago.

The facts contained in Defendants' Rule 56.1 Statement of Material Facts, which are supported by evidence in the record, are, therefore, deemed admitted. See Allen v. City of New York, 480 F. Supp. 2d 689, 703 (S.D.N.Y. 2007) ("If the opposing party fails to respond to the moving party's Rule 56.1 Statement, then the material facts contained in the moving party's statement are deemed admitted as a matter of law.") (citing Giannullo, 322 F.3d at 140); see also Am. Med. Ass'n v. United Healthcare Corp., No. 00 Civ. 2800 (LMM), 2007 WL 1771498, at *2 (S.D.N.Y. June 18, 2007). However, recognizing that Plaintiff is proceeding pro se, and has previously included some documentary evidence, including grievance records, sick call request forms, and Dr. Magill's

---

[8] Plaintiff had been informed of this Court's rule that requests for extensions of time are required to be submitted at least ten days in advance of a deadline. (See Scheduling Order, dated July 1, 2008.)

consultant's report, as attachments to his Complaint, (See Compl. at 13-42; Am. Compl. at 13-48), the Court will consider whatever competent evidence Plaintiff has submitted in determining whether there is a basis to dispute the assertions in Defendants' motion.

III. Eighth Amendment Standard

A prisoner's claims of unconstitutional medical care are governed by the Eighth Amendment. To demonstrate an Eighth Amendment violation by prison medical personnel, a plaintiff must come forward with facts demonstrating that each defendant acted with deliberate indifference to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291 (1976); see also Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (noting that while prison officials may not be deliberately indifferent to a prisoner's serious medical needs, "not every lapse in medical care is a constitutional wrong") (citing Farmer v. Brennan, 511 U.S. 825, 832, 844, 114 S. Ct. 1970, 1976 (1994)). There is a two-part inquiry when determining whether a lapse in medical care has risen to the level of a constitutional wrong: one objective, the other subjective. See Salahuddin, 467 F.3d at 279.

Courts conduct an objective analysis to determine whether "the alleged deprivation of adequate medical care was 'sufficiently serious.'" See id. (quoting Farmer, 511 U.S. at 834, 114 S. Ct. at 1977). Determining whether the care a prisoner received meets the objective standard requires an additional two-

17

part inquiry.  See Salahuddin, 467 F.3d at 279.  First, courts focus on the adequacy of the care.  See id.  Under this part of the analysis, "prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishments Clause." Id. at 279-80 (quoting Farmer, 511 U.S. at 845, 114 S. Ct. at 1983).  Second, courts focus on the seriousness of a plaintiff's medical needs.  Id. at 280. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'"  Id. (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); see also Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003).  Determining the seriousness of a medical condition depends on the deprivation of care that the prisoner has alleged.  If the prisoner has alleged that the prison failed to treat his condition at all, then courts will consider the severity of the medical condition itself.  However, if the alleged violation is a disruption or delay in treatment, then "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."  Smith

18

v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003); see also Salahuddin, 467 F.3d at 280.

The subjective part of the deliberate indifference analysis focuses on whether the charged official acted "with a sufficiently culpable state of mind." Salahuddin, 467 F.3d at 280 (citing Wilson v. Seiter, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm." Id. (emphasis added). Rather, the charged official must "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Id. (citing Farmer 511 U.S. at 836-37, 114 S. Ct. at 1978). Essentially, a defendant must, at a minimum, act with reckless disregard of a serious risk of harm. However, "recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." Id. Thus, "[t]he charged official must be subjectively aware that his conduct creates such a risk," and if a defendant sincerely and honestly believes that his conduct does not create such a risk, "even if objectively unreasonable," he does not possess a sufficiently culpable state of mind. Id. at 281.

A.  Plaintiff's Eighth Amendment Claims

Plaintiff alleges the following claims: (1) that Nurse Jones

and Nurse Hansen gave him improper medical care during the February 20, 2004 hypoglycemic incident, (2) that Dr. Perilli and Dr. Weinstein failed to adequately treat his injured hand and arm, and (3) that the "John Doe HMO" improperly denied or withheld approval for the post-surgery physical therapy Plaintiff had been prescribed.

### 1. Claims Against Nurse Hansen

Because Plaintiff has failed to serve Nurse Hansen with process in the two years this action has been pending, his claims against her must be dismissed. See Fed. R. Civ. P. 4(m). A Court Order required that Plaintiff serve Nurse Hansen by September 24, 2007.[9] (See Order, dated July 27, 2007.) Plaintiff was given Hansen's address by Defendants' counsel, but he never effected service. (See Gonzalez Dep. at 165-66.) Defendants' counsel informed Plaintiff over a year ago that Nurse Hansen had never been served, (See id.), but since then, Plaintiff has made no apparent effort to address the issue. Plaintiff's claims against Nurse Hansen should, therefore, be dismissed.

### 2. Claims Against Nurse Jones

Plaintiff alleges that, during his diabetic seizure, Nurse Jones's repeated attempts to insert the IV needle caused his arm

---

[9] After Plaintiff made an unsuccessful attempt to serve Nurse Hansen on May 31, 2007, the Court directed Defendants' counsel to assist Plaintiff by providing an address at which she could be served, and ordered Plaintiff to effectuate service by September 24, 2007. (See Order, dated July 27, 2007.)

to swell with edema.   According to Plaintiff, that, in turn, caused him to develop carpal tunnel syndrome.   He contends that Nurse Jones should have chosen a different treatment, glucagon, which can be injected directly into the muscle.   That, Plaintiff claims, would have avoided the difficulty that Nurse Jones had in finding a vein in which to insert the IV line.

This claim does not rise to the level of an Eighth Amendment violation.   There is no dispute that severe hypoglycemia, resulting in a diabetic seizure, constitutes a serious medical condition.   However, there is no evidence that Nurse Jones was deliberately indifferent to Plaintiff's condition.

The record shows that Nurse Jones and her colleagues responded promptly to the urgency of Plaintiff's condition.   As soon as Plaintiff arrived in the emergency room, Jones examined him and found that his blood sugar was low.   (See Defs.' R. 56.1 Stmt. ¶ 15; Jones Aff at ¶ 11.)   Jones then took immediate steps to remedy that problem, first trying oral glutose solution, then a syringe of dextrose, and then finally administering the intravenous dextrose that successfully remedied Plaintiff's hypoglycemia and ended his seizure. (See Defs.' R. 56.1 Stmt. ¶¶ 16-22; Jones Aff. ¶¶ 12-17.)

Nevertheless, Plaintiff contends that he suffered harm because Nurse Jones and Nurse Hansen decided to treat his hypoglycemia by injecting dextrose into his vein, instead of

21

glucagon into his muscles.   (See Pl.'s Am. Compl. at 17-27.)
However, the mere fact that Nurse Jones did not give Plaintiff the
treatment he claims, in retrospect, would have resulted in fewer
side effects, is insufficient to establish that she violated his
Eighth Amendment rights.   A plaintiff's mere disagreement with the
care he received, or preference for another course of treatment,
does not give rise to an Eighth Amendment violation.   See Estelle,
429 U.S. at 107-108, 97 S. Ct. 293-294;   Salahuddin,   467 F.3d at
279.

While it is true that prison medical staff are not permitted
to ignore the consequences of the treatments they choose, a
treatment's side effects or complications are not enough to
demonstrate deliberate indifference unless they are so obvious or
egregious that they constitute the "wanton" infliction of pain.
For instance, courts in this Circuit have found that it was
improper to simply close a wound caused by the severing of a
plaintiff's ear, rather than attempting to reattach the ear see
Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974), or to
extract a tooth, rather than fill a cavity, see Chance v.
Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).   See also Thomas v.
Pate, 493 F.2d 151, 158 (7th Cir. 1974)(nurse was deliberately
indifferent when she injected prisoner with penicillin even though
she was aware of his penicillin allergy).   In cases where a
treatment's negative consequences are mild or unforseen, however,

22

the mere fact that they occurred is not sufficient to state a claim for deliberate indifference. "The Eighth Amendment is not a vehicle for bringing medical malpractice claims." <u>Smith</u>, 316 F.3d at 184.

Here, there is simply no evidence that would allow a reasonable juror to conclude that Nurse Jones's decision to administer intravenous dextrose during Plaintiff's hypoglycemic episode demonstrated "deliberate indifference." Plaintiff has not submitted any competent evidence indicating that dextrose is not an appropriate treatment, or is so dangerous that no reasonable medical professional would have used it. Plaintiff's claim that Nurse Jones should have administered glucagon, instead, is merely his medically unsupported view about an alternative treatment. In any event, Nurse Jones was not actually able to use glucagon to treat Plaintiff. Pursuant to a Sing Sing protocol, it was not available for administration at the time of Plaintiff's hypoglycemic episode. (<u>See</u> Jones Aff. ¶ 20.) And, even if it had been, Jones would not have been able to administer it, because only physicians were permitted to make such treatment judgments. (<u>See</u> <u>id</u>.)

Nurse Jones was responding to an emergency situation. After several other treatments failed to bring about a response, she administered IV dextrose, which was effective in halting Plaintiff's seizure. Plaintiff has submitted no competent

23

evidence demonstrating that the chosen course of treatment was inappropriate, or that his proposed treatment, injection of glucagon, would have been more appropriate.

In short, at most Plaintiff has alleged a disagreement over the treatment he received, which is insufficient to establish an Eighth Amendment violation. See Smith, 316 F.3d at 184; Estelle, 429 U.S. at 107-108, 97 S. Ct. at 293. Based on the record, no reasonable juror could conclude that Nurse Jones was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, the claims against Nurse Jones should be dismissed.

### 3. Claims Against Drs. Perilli and Weinstein

Plaintiff's second claim is that Defendants Perilli and Weinstein improperly delayed and denied the treatment for his injured arm and hand, prolonging his pain and other symptoms. He alleges that Dr. Perilli obstructed his attempts to be seen by a specialist who could treat the injury, and that Dr. Weinstein did not properly examine the injured arm. However, Plaintiff's allegations are contradicted by the record, which shows that Dr. Perilli referred Plaintiff to specialists and approved him for surgery, and that Defendant Weinstein's examination was thorough and detailed. The record is likewise lacking in any evidence that Doctors Perilli or Weinstein deliberately or recklessly caused Plaintiff harm. Plaintiff has thus failed to present sufficient evidence to defeat summary judgment on this claim.

24

a. <u>Serious Medical Need</u>

Plaintiff claims that, after the February 20 hypoglycemic episode, he developed problems with his hand, wrist, and forearm. He suffered from chronic pain, as well as tingling and numbness so strong that they caused Plaintiff to awake from sleep. (<u>See</u> Letter from Dr. Richard M. Magill, M.D., attached to Pl.'s Am. Compl. at 28.) The Sing Sing medical staff tried to treat Plaintiff's symptoms by splinting his arm and giving him pain medication, but his symptoms persisted. (<u>See</u> Halko referral notes, May 22 2004, Reznik Decl. Ex D at 64.) Eventually, Plaintiff was diagnosed with carpal tunnel syndrome and tendon adhesions in the flexor tendons of his left forearm. Dr. Magill, the surgeon who made that diagnosis, performed surgery to correct the problems on September 22, 2004.

Applying the three <u>Brock</u> factors, (1) "whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment," (2) whether the medical condition "significantly affects daily activities," and (3) whether the Plaintiff has suffered from "chronic and substantial pain," <u>Brock</u>, 315 F.3d at 162, the Court concludes that Plaintiff's injury was sufficiently serious to meet that prong of the objective element of the deliberate indifference test. See <u>Burton v. Lynch</u>, No. 08 Civ. 8791 (LBS), 2009 WL 3286020 (S.D.N.Y. Oct. 13, 2009) (finding that carpal tunnel

syndrome that was severe enough to require surgery, and which left the plaintiff unable to stretch out or fully utilize his left arm, had satisfied two of the three <u>Brock</u> factors and was a serious medical need).

    b. <u>Adequacy of Care</u>

As with the definition of "serious medical condition," there is no bright line rule for what constitutes adequate medical treatment. The adequacy analysis considers the effectiveness of the treatment the prisoner received, and the harm that resulted from the alleged shortfalls. In some cases, such as minor injuries that will heal on their own with time, "adequate treatment" may require little or no medical care at all. <u>Evering v. Rielly</u>, No. 98 Civ. 6718 (DAB), 2001 WL 1150318 (S.D.N.Y. Sept. 28, 2001) (untreated "superficial injuries that require time to heal" did not implicate Eighth Amendment). Likewise, if the illness or injury was unaffected by an alleged deficiency in care, then that inconsequential lapse will not render the treatment inadequate. <u>See</u> <u>Smith</u>, 316 F.3d at 187 (upholding jury verdict against prisoner, and finding that interruptions in HIV treatment regimen did not render care inadequate, because there was no evidence that they resulted in permanent or ongoing damage to his health); <u>Evans v. Bonner</u>, 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (untimely provision of medication to HIV-positive inmate did not cause sufficiently serious injury to give rise to an Eighth

Amendment violation). However, if the failure to provide treatment caused the prisoner's medical condition to degenerate or persist unnecessarily, then such treatment may be considered inadequate. See Chance, 143 F.3d at 702 (noting that "the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection"). "A failure to treat serious, chronic pain adequately when such treatment is available can constitute a sufficiently serious deprivation of medical care. . . . This is true even when other, substantial medical care is given for the underlying condition." Williams v. Smith, No. 02 Civ. 4338 (DLC), 2009 WL 2431948, at *10 (S.D.N.Y. Aug. 10, 2009). See also Salahuddin, 467 F.3d at 281 (presumption that five month failure to treat pain caused sufficiently serious harm).

Here, Defendants have submitted medical records and sworn statements showing that Plaintiff received regular care for his hand and arm injury, including examinations by doctors within Sing Sing, evaluations by two specialists, and eventually surgery. Plaintiff has not alleged that the surgery he received was insufficient, ineffective, or otherwise improper. While Plaintiff was frustrated with the pace at which he was given referrals to specialists, Dr. Weinstein, the first specialist who examined him, performed a thorough examination in June of 2004, and recommended that Plaintiff return in three months to determine whether there

27

had been any change in his condition.  Dr. Perilli, however, did not wait three months.  The following month, Plaintiff saw a surgeon, Dr. Magill, and two months later Dr. Magill performed surgery.  This was not an inordinate delay, and Plaintiff has not submitted any evidence to show that his condition degenerated during that period.

The record does show that Plaintiff complained of significant pain throughout the period between the February 20, 2004 IV insertion and the September 22, 2004 surgery.  However, the pain did not go untreated.  Within ten days of the injury, Plaintiff was seeing the sick call nurse regularly for Tylenol, (See Pl.'s March 1, 2004 letter to Sing Sing Superintendent, attached to Am. Compl., at 41-42; Pl.'s March 1, 2004 sick call request form, attached to Am. Compl. at 43), and when that proved insufficient, Dr. Halko attempted to relieve Plaintiff's pain with NSAIDs and splinting. (See Halko referral notes, May 22 2004, Reznik Decl. Ex D at 64; see also Weinstein notes on June 1, 2004 consult, Reznik Decl. Ex. D at 64.)   When Plaintiff's pain persisted, he was given surgery to treat the underlying problem.

The fact that Plaintiff's pain persisted until he received surgery does not mean that the treatment he received was substandard.  Moreover, there is nothing in the record indicating that there was a more appropriate treatment for his pain, short of surgery.  Finally, other than faulting Dr. Perilli for interfering

28

with his access to specialists, Plaintiff does not appear to contend that any of the Defendants was involved in treating his complaints of pain. Dr. Halko was Plaintiff's treating physician, but Plaintiff has not named him as a defendant or alleged any deficiencies in the standard of care that Halko provided.

    c. <u>Subjective Element</u>

In any event, Plaintiff has failed to satisfy the subjective element required to establish an Eighth Amendment violation. No reasonable juror could conclude, on the basis of the factual record, that either Dr. Perilli or Dr. Weinstein was deliberately indifferent to Plaintiff's serious medical needs.

Plaintiff accuses Dr. Perilli of "delaying" and "undermining" his treatment, (Gonzalez Dep. at 167-68), but points to no evidence to support that contention.[10] Dr. Perilli was the Sing Sing Medical Director, not Plaintiff's treating physician. Yet, after Plaintiff was seen by his treating physician, Dr. Halko, approximately two weeks after the hypoglycemic episode, and Dr. Perilli was informed that Plaintiff claimed to have been injured

---

[10] The documents submitted to the Court suggest that Plaintiff was actually dissatisfied with Dr. Perilli's view that Plaintiff's carpal tunnel syndrome was caused by his diabetes and not the IV insertion, as Plaintiff believes. Apparently, this caused Plaintiff to perceive Perilli as intentionally undermining his treatment. (<u>See</u> Am. Compl. at 8 (describing Perilli's opinion that diabetes caused the carpal tunnel as "untruthful" and "biased"); Gonzalez Dep. at 166-167, (accusing Dr. Perilli of coming up with "excuses" for the carpal tunnel syndrome, and "procrastinating" on getting Plaintiff further treatment).)

by the IV infiltration, eight days later he examined Plaintiff himself. (See Defs.' R. 56.1 Stmt. ¶ 37.)   In that examination, Dr. Perilli found no sign of inflammation or infection, but did find that Plaintiff was positive for Tinel's sign, and so referred Plaintiff to Dr. Weinstein for a full NCS/EMG test. (See id. ¶ 39.) After Dr. Weinstein concluded that Plaintiff did have some degree of nerve damage, he recommended that Plaintiff return for further examination in three months if there was no improvement in Plaintiff's condition.   Nevertheless, because Plaintiff's pain continued, only one week later Dr. Perilli referred Plaintiff to Dr. Magill, an outside specialist in hand surgery, for further evaluation.   The surgery took place less than two months later. (Id. ¶ 43.)  Based upon the record before the Court, no reasonable juror could find that Dr. Perilli knowingly or recklessly delayed or obstructed Plaintiff's care.

The record similarly lacks any support for Plaintiff's contention that Dr. Weinstein was deliberately indifferent to Plaintiff's medical needs.  Dr. Weinstein had a very limited role in Plaintiff's care.  Plaintiff's treating physician, Dr. Halko, referred Plaintiff to Dr. Weinstein for an NCS/EMG examination. Dr. Weinstein was not responsible for Plaintiff's ongoing care, or for evaluating the effectiveness of his treatment regimen.   His only role was to evaluate him for nerve and muscle damage.

Plaintiff alleges that Dr. Weinstein's examination was not

30

thorough enough.  He claims that Weinstein's tests were limited to his left wrist and hand, and that the doctor should have also "diagnosed the forearm," because of the "extreme" and "excruciating" pain that Plaintiff felt in that area. (See Am. Compl. at 5.)  However, the record shows that Dr. Weinstein *did* evaluate Plaintiff's entire left arm, and his entire right arm as well.  Dr. Weinstein's report describes a thorough evaluation of both of Plaintiff's arms, including a physical exam, a set of NCS tests for nerve damage, and a set of EMG tests for muscle damage. He wrote a detailed report and recommended a follow-up MRI, as well as a second NCS/EMG exam in three months if Plaintiff's condition had not improved.  Dr. Weinstein was not Plaintiff's treating physician, was only asked to conduct the NCS/EMG examination, and did so in a thorough manner.  There is simply no basis on which a reasonable juror could conclude that he was "deliberately indifferent" to Plaintiff's serious medical needs.

Accordingly, both Dr Perilli and Dr. Weinstein are entitled to summary judgment.[11]

---

[11] Because the Court has found that Plaintiff's Eighth Amendment rights were not violated, there is no need to examine whether Defendants were personally involved in the alleged violations. Likewise, because the Court has not found that any of the Defendants were deliberately indifferent to Plaintiff's medical needs, there is no need to address whether they are entitled to qualified immunity.

d. Plaintiff's Claims Against "John Doe HMO"

Plaintiff claims that Defendant John Doe HMO "biasedly" denied requests for necessary treatment, including post-surgery physical therapy. (See Am. Compl. at 5.)   However, Plaintiff never identified the John Doe HMO or served it with process. Accordingly, the claims against the John Doe HMO should be dismissed. See Fed. R. Civ. P. 4(m).

On August 13, 2007, the Court directed counsel for Defendants to provide Plaintiff with sufficient information to identify and serve the "John Doe" Defendants. (See Order, dated Aug. 13, 2007.) On November 14, 2007, Defendants' counsel informed the Court that she could not discern the identity of any HMO that was involved in the treatment of Plaintiff's carpal tunnel syndrome.   (See Letter from Assistant Attorney General Inna Reznik to the Court, dated Nov. 14, 2007.)  Plaintiff took no further action with respect to the John Doe HMO.  Plaintiff's claim against Defendant John Doe HMO, therefore, should be dismissed for failure to effect service.

CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' motion for summary judgment be granted, and all claims against Defendants Jones, Perilli, and Weinstein be dismissed. Plaintiff's claims against Defendant Hansen and the John Doe HMO should also be dismissed for failure to effect service.

32

chambers of the Honorable Loretta A. Preska, U.S.D.J., and to the chambers of the undersigned, Room 1660.   Any requests for an extension of time for filing objections must be directed to Judge Preska.   Failure to file objections will result in a waiver of those objections for purposes of appeal.   See Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002); Spence v. Superintendent, 219 F.3d 162, 174 (2d Cir. 2000).

                                        Respectfully submitted,

                                        _____
                                        THEODORE H. KATZ
                                        UNITED STATES MAGISTRATE JUDGE


Dated: November 20, 2009
       New York, New York


Copies sent to:

Inna Reznik, Esq.
Assistant Attorney General of the State of New York
120 Broadway
New York , NY 10271

Patrick Gonzalez
82A4083
Great Meadow Correctional Facility
11739 State Rte 22
Comstock, NY 12821

33